**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4456
_____

In re: LEMINGTON HOME FOR THE AGED

OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
ON BEHALF OF THE ESTATE OF LEMINGTON HOME
FOR THE AGED,

                             Appellant

v.

ARTHUR BALDWIN; LINDA COBB; JEROME
BULLOCK; ANGELA FORD; JOANNE ANDIORIO; J.W.
WALLACE; TWYLA JOHNSON; NICOLE GAINES;
WILLIAM THOMPKINS; ROY PENNER; MELODY
CAUSEY; JAMES SHEALEY; LEONARD R. DUNCAN;
RENEE FRAZIER; CLAUDIA ALLEN; EUGENE
DOWNING; GEORGE CALLOWAY; B. J. LEBER;
REVEREND RONALD PETERS
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 2-10-cv-00800)
District Judge: Honorable Arthur J. Schwab
_____

Argued July 11, 2011

Before: SLOVITER, FUENTES and VANASKIE,
*Circuit Judges*.

(Filed: September 21, 2011)

Robert S. Bernstein, Esq.
Kirk B. Burkley, Esq.
Nicholas D. Krawec, Esq. *Argued*
Krawec Bernstein Law Firm, PC
707 Grant Street
Suite 2200, Gulf Tower
Pittsburgh, PA 15219-0000
        *Counsel for Appellants*

Mark R. Hamilton, Esq. *Argued*
Philip J. Sbrolla, Esq.
Cipriani & Werner
650 Washington Road
Suite 700
Pittsburgh, PA 15228

Todd M. Raskin, Esq.
Mazanec, Raskin & Ryder
100 Franklin's Row
34305 Solon Road
Cleveland, OH 44139
        *Counsel for Appellee Arthur Baldwin*

Suzanne B. Merrick
Thomas, Thomas & Hafer
301 Grant Street
One Oxford Centre, Suite 1150
Pittsburgh, PA 15219-0000
    *Counsel for Appellee James Shealey*

_____

OPINION OF THE COURT
_____

VANASKIE, *Circuit Judge*.

The Committee of Unsecured Creditors ("the Committee") on behalf of the Estate of the Lemington Home for the Aged ("the Home") appeals the District Court's decision to grant summary judgment in favor of defendants, the officers and directors of the Home, on the Committee's breach of fiduciary duty and deepening insolvency claims. The District Court found that summary judgment was appropriate because the business judgment rule and the doctrine of *in pari delicto* barred recovery on the breach of fiduciary duty claims, and because the Committee was unable to demonstrate a material issue of fact concerning whether the defendants committed the fraud necessary to support a claim of deepening insolvency. Because our independent review of the record discloses genuine disputes of material facts on all claims, we will vacate and remand for trial.

I.

The Home, a nonprofit corporation, has a storied place in history. As the city of Pittsburgh grew in influence as an industrial and manufacturing center in the 19th century, its diverse population swelled. By 1870, the city had a population of 86,076, a 74% increase in just ten years. Among this population were about 2,000 African-Americans, mostly free blacks who had been born in the North, a few post-Civil War migrants from the South, as well as some runaway slaves and their descendants. Many of these people did not share in the industrial prosperity enveloping the city, struggling both to make ends meet and to secure the civil rights guaranteed to them by the Constitution.

In 1877, Mary Peck Bond, a daughter of Pittsburgh African-American abolitionist and minister John Peck, is said to have discovered that her friend, former slave and then-centenarian "Aunt Peggy," was living alone in squalor in a damp basement. Together with friends, Mrs. Bond worked to raise funds to provide a place of refuge for elderly members of the African-American community. This effort's first incarnation, "The Home for the Aged and Infirm Colored Women," was incorporated and dedicated on July 4, 1883. Eventually, this facility would become known as the "Lemington Home for the Aged," also known as "Lemington Center." The Home was affiliated with Lemington Elder Care Services, with which it had an interlocking Board of Directors. In 1983, the Home was relocated to a facility on Lincoln Avenue in Pittsburgh, and expanded to about 180 beds.

Almost immediately from the time of its relocation in 1983, the Home was beset with financial troubles. In its first year at the new facility, the Home operated at a loss of $429,000. Although an initial projection had indicated that the Home would profit, this was based on "the Center being aggressively marketed to produce . . . a more even mix of Medicare, Medicaid, and private pay patients." (*Id.* at 271.) Instead, "95% of [the Home's] patients receiv[ed] Medicaid, 4.5% Medicare and 0.5% private payors." (*Id.*)

This stagnation continued through the 1980s and into the 1990s. Because the Home's financial condition was rapidly deteriorating, the City of Pittsburgh, Allegheny County, and several private foundations periodically assisted to keep the Home in operation. By late 1986, the Home was again maintaining its own operations, but had $4 million in deferred mortgage debt.

Unfortunately, the Home's financial condition again deteriorated. The U.S. Department of Health and Human Services implemented a month-long ban on new admissions in September, 1998. A comprehensive long-range plan formulated at the Home's direction by Hershberg Salter Associates in 1997 found that the Home had image problems within the community, and recommended, among other things, that it should hire an Administrator, a "quality human resources staff," and outside specialists. (*Id.* at 280-81.)

Defendant Melody L. Causey was hired as the Home's Administrator in September, 1997. By 1999, the Home was

5

insolvent. "Going concern" warnings[1] accompanied audits for fiscal years 2002 and 2003.[2] As of June 30, 2002, the Home's total liabilities exceeded total assets by $1,941,959, and total liabilities exceeded total assets by $1,675,397 at the end of the 2003 fiscal year. In 2001, a study funded by the Pittsburgh Foundation recommended that the Board replace Causey with a "qualified, seasoned nursing home administrator," (A. 1179) and "review, revamp and re-staff each department" (A. 1214). The Foundation provided a grant of more than $175,000 to hire a new Administrator. Causey, however, decided to use the grant for other purposes.

In December of 2002, Defendant James Shealey became the Home's Chief Financial Officer. Shealey failed to maintain a general ledger, and the Home's financial and billing records were in deplorable condition. In March of 2004, the Board was informed that employee insurance premiums were not paid even though payroll deductions had been made for that purpose.

Beginning in 2003, the Home was cited for numerous deficiencies "primarily as a result of staff failing to document services rendered." (*Id.* at 1355.) Causey commented that "we continue to employ staff that should no longer be employed by our organization" and "in the last eighteen months, the nursing department alone caused the facility to receive[] 22 nursing care deficiencies." (*Id.* at 1527.) According to Causey, in April or May, 2004, she informed

---

[1] The "going concern" notices are intended to warn that the "continued viability of an enterprise is in doubt." (A. 6.)

[2] The Home's fiscal year ended on June 30th.

6

the Board of Directors that, due to health problems, she had been placed on part-time work status by her physicians. According to her administrative assistant, she was absent from the Home for periods of up to six or eight weeks at a time. She was not replaced, although state law required the Home to employ a full-time, licensed administrator.

From November of 2003 to January of 2005, the Board position of Treasurer was vacant. The Treasurer was to chair the Board's Finance Committee. There is evidence that there was no meaningful oversight of the Home's financial operations during this period.

In May of 2004, Causey recommended that the Home file for bankruptcy. The Board opted to pursue other options at that time. One of the options was obtaining a $1,000,000 loan from the Lemington Home Fund, which was administered by the Pittsburgh Foundation. Approval of the loan was conditioned upon the Board having a viability study conducted. The Board declined to pursue such a study.

The Home's problems came to a head on July 26, 2004, when resident Terry Norwood, who suffered from advanced diabetes, was found unresponsive without a pulse. Although he had an advanced directive which specified that, if he ceased to breathe, he should be resuscitated, no such action was taken. Instead, a nurse left a message on a physician's pager. Because of this death, the Pennsylvania Department of Health cited the home for neglect, placed the Home's license on provisional status, and provided a 90-day window for the Home to correct its deficiencies.

The Home's accounting firm declined to continue to work for the Home in the Fall of 2004 due to non-payment of

7

its bills. A medical records and billing consultant terminated her services in August of 2004 due to non-payment.

Another resident, Elaine Carrington, died at the Home on December 17, 2004, under circumstances suggesting neglect. Because of this death, the Pennsylvania Department of Health conducted another investigation. Among other things, the Department noted that "[a]n administrator, or a designee, is not present on the premises on a 24-hr. basis. In the administrator's frequent absence, staff are confused as to whom is to be in charge of the PC Unit." (*Id.* at 1379.) The Department further noted that "[t]he Administrator failed to report . . . the unusual death of resident EC on 12/19/04" (*id.* at 1385) and it "determined that the Administrator, Mel Causey, lack[ed] the qualifications, the knowledge of the PC regulations and the ability to direct staff to perform personal care services as required" (*id.* at 1393.)

At the time of these incidents, records indicate that the Board itself was in disarray. Minutes of Board meetings were incomplete or non-existent. Administrator Causey noted in a deposition that minutes were never kept of executive sessions, at which compensation, among other issues, was discussed. Attendance at Board meetings was often below 50%. Although the Board's by-laws required a Finance Committee with the Board Treasurer as chairperson, the position of Treasurer remained unfilled. Instead, the Board relied on the advice of Chief Financial Officer Shealey, although, as Board Chair Arthur Baldwin noted in his deposition, the Board was aware as early as December 2004 that Shealey was not maintaining financial records.

At its meeting on January 6, 2005, the Board considered options in case a proposed merger with the

8

University of Pittsburgh Medical Center did not occur. The Board considered two options: bankruptcy and restructuring. At this meeting, the Board voted "to close the nursing home and assisted living entities," "to retain Eva P. Mitchell, community services [sic] and, if possible, Lemington Residential Corporation #2," and "to continue pursuing UPMC for a possible merger/acquisition of Lemington." (*Id.* at 1371.)

The Board did not approve the filing of a bankruptcy petition for another three months. Instead, at its January meeting, the Board "agreed to stop admissions to [the nursing home and assisted living facility] immediately." (*Id.* at 1372.) At this meeting, the Board further noted that it was "informed that Mel Causey ha[d] been working from home on a part-time basis for several months and, as such, was not in control of the activities that were taking place at the facilities." (*Id.*) The Board voted to terminate Ms. Causey. In March, 2005, the Board hired Elizabeth Garrett as an administrator. The Board informed Ms. Garrett that, because it had decided to declare bankruptcy, the facility would not be receiving new patients.

Handwritten notes from a Board meeting held on March 15, 2005 indicate discussion of plans to transfer the Home's principal charitable asset, the Lemington Home Fund, held by the Pittsburgh Foundation, to Lemington Elder Care, an affiliated entity. The members of the Home's Board were also directors of Lemington Elder Care. By March 17, 2005, the Pennsylvania Department of Health determined that the Home's deficiencies had been corrected. On March 24, 2005, a document called the "Lemington Elder Care Transition Action Plan" was created, which, among other

9

things, provided for the "Lemington Elder Services restructuring process," to "Close Lemington Nursing Home and Assisted Living Facilities," "Obtain funding to assist with the transition and restructuring of Lemington Elder Care," "Enlist all possible selling options of the Lemington Nursing Home and Assisted Living Facility," "Conduct Bankruptcy Filing of Lemington Nursing Home & Assisted Living Entities," and "Restructure Lemington Elder Care to include Community Services, Eva P. Mitchell and HUD #2 Project." (*Id.* at 812-815.) Consistent with the plan to shift the Home's principal charitable asset to Lemington Elder Care, on May 27, 2005, Chairperson Baldwin drafted a letter to be signed by the Pennsylvania Secretary of Aging, requesting that the Pittsburgh Foundation provide

> financial assistance to be used by Lemington Center for legal counsel, communications support, insurance and the services of a turnaround expert in order to orchestrate a caring, orderly and safe transition for its nursing home and assisted living residents as Lemington Center discontinues nursing home and assisted living services and works through bankruptcy reorganization.

(*Id.* at 808.)

On April 13, 2005, the Home filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Western District of Pennsylvania. The Committee of Unsecured Creditors was appointed two weeks later. In early May, W. Terrence Brown was hired by one of Lemington's creditors to investigate the company's financial situation.

10

According to Brown's report, Shealey "admitted that the general ledger and accounting system had not been maintained 'for some time' because of lack of staff and trained staff." (*Id.* at 878.) Furthermore, Mr. Brown reported that he was unable to obtain "records of any checks written, deposits made, bank statements or bank statement reconciliations for any month of the current fiscal year. . . . I do know that accounting records problems go back to at least November 2003 and I do not know if the accounting system itself was maintained after November 2003." (*Id.* at 879.) Importantly, Mr. Brown also related that "[t]he billing clerk also admitted and Mr. Shealey confirmed that no Medicare billings had been submitted to Medicare since at least August 2004. . . . I estimate that during this period there were approximately 2,000 unbilled Medicare patient days." (*Id.*)

On June 9, 2005, the Bankruptcy Court directed the Debtor-in-Possession to obtain a viability study from PrimusCare, a company previously hired by the Debtor. In its report dated June 22, 2005, PrimusCare first noted that "[t]he facility cannot operate in its current condition . . . and without an influx of anticipated Medicare Recovery Funds would be insolvent by the beginning of August. . . . Claim recovery efforts are currently underway." (*Id.* at 1582.) Among other things, PrimusCare further opined that

> [t]he overall knowledge of the Department Heads appears to be limited. Many have been placed into positions without solid training on the main functions of their duties. Basic internal controls are missing in many key areas including census tracking, accounts receivable, accounts payable, payroll, and resident trust

11

accounts. . . . Without these key internal controls in place the facility is unable to monitor and track financial performance.

(*Id.* at 1594.)[3]

PrimusCare also highlighted a number of positive factors for the Home, including a high local population of senior citizens, support from local government officials and families, and local hospital interest in referring patients to the Home. Consequently, PrimusCare concluded, if the Home improved its image, recruited and developed qualified staff, and secured approximately $2 million in working capital needed to make necessary reforms, it could achieve the 90% occupancy rate necessary to continue operations. PrimusCare suggested that some of the necessary funding could be obtained by, among other things, collecting approximately $500,000 in unpaid Medicare reimbursements, appealing to government sources for rate relief, and re-working the Home's debt structure and the collective bargaining

---

[3] This lack of records was underscored in a later e-mail detailing PrimusCare's efforts to reconstruct the Home's financial records: "The indicated available funds from [Medicare claims] . . . is substantially less than the amount estimated due [to] our discovery of the following: 1[.] The census data was not accurate. . . . 2. A number of the patients did not have appropriate documentation . . . . it is hard to appreciate the lack of any viable financial structure. Virtually all information we have sought in order to complete the claims for submission has required painful searching an[d] searching in order to construct/reconstruct the information required." (A. 1849.)

12

agreement. Notably, PrimusCare recommended that "board members with for-profit, long term care management experience" should be added, that "[e]ngaging a seasoned, long term care management company with local and diverse management experience is essential," and that "[r]ecruitment of key personnel with tremendous experience is vital." (A. 1596.)

The Home delayed filing its Monthly Operating Reports for May and June until September 2005. If they had been filed, they would have shown that the Home received nearly $1.4 million in Nursing Home Assessment Tax payments.

At a Bankruptcy status conference held on June 23, 2005, no one expressed any interest in funding or acquiring the Home. Consequently, the Bankruptcy Court approved closure of the Home and the transfer of its residents to other facilities.

On November 27, 2005, the Bankruptcy Judge granted the Committee's motion to commence an adversary proceeding against the Home's directors and officers. On August 27, 2007, the Official Committee of Unsecured Creditors filed its Second Amended Complaint on behalf of the Debtor, asserting causes of action against the directors and officers for breach of the fiduciary duties of care and loyalty and for deepening insolvency. On September 10, 2010, the directors and officers filed a Joint Motion for Summary Judgment. On October 25, 2010, the District Court granted the motion, finding that the business judgment rule and the doctrine of *in pari delicto* applied to preclude the Committee's breach of fiduciary duty claims. The District Court also found that, even considering the evidence in the

13

light most favorable to the Committee, the Committee would be unable to show that there was fraud necessary to support a claim of deepening insolvency.  This appeal followed.[4]

## II.

Our review of a District Court's grant of summary judgment is plenary.  *Official Committee of Unsecured Creditors of Allegheny Health, Educ. and Research Found. v. PricewaterhouseCoopers, LLP*, 607 F.3d 346, 351 (3d Cir. 2010).  Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is "[a] fact[] that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  For an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *Id.* at 248-49 (quoting *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968) (internal quotation marks omitted)).

Because Appellants have brought claims for breach of fiduciary duty as well as for deepening insolvency, we will examine whether summary judgment is appropriate for each of these in turn.

---

[4] In this bankruptcy adversary proceeding, the District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1334(b).  We have jurisdiction pursuant to 28 U.S.C. § 1291.

A.

Pennsylvania law, which codifies the fiduciary duties owed by directors and officers of a corporation, provides as follows for directors:

> A director of a nonprofit corporation shall stand in a fiduciary relation to the corporation and shall perform his duties as a director . . . in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances. In performing his duties, a director shall be entitled to rely in good faith on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following: (1) One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented. (2) Counsel, public accountants or other persons as to matters which the director reasonably believes to be within the professional or expert competence of such person. . . . (b) *Effect of actual knowledge*. – A director shall not be considered to be acting in good faith if he has knowledge concerning the matter in question that would cause his reliance to be unwarranted.

15 Pa. Cons. Stat. Ann. § 5712(a)-(b) (2011). The standard of care for officers is set forth as follows:

> [A]n officer shall perform his duties as an officer in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances.

*Id.* § 5712(c). These fiduciary duties are owed not only to the corporation and its shareholders, but also to the creditors of an insolvent entity. See *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 987-88 (3d. Cir. 1998). Certainly, then, it is material whether the directors' reliance upon the information provided by one or more officers or employees was in "good faith," and whether there was a reasonable basis for relying upon officers and employees of the corporation. It is likewise material whether the officers have exercised "reasonable inquiry, skill and diligence" in performing their duties.

In support of its claim of a breach of the duty of due care, the Committee contends that the Board relied on Administrator Causey's judgment, notwithstanding that it was aware that she was working part-time in violation of state-law requirements, and had a string of deficiencies on her watch. Furthermore, the Committee asserts that the Board failed to follow its established governance structure in not appointing a treasurer and a finance committee. It thus did not discover Shealey's complete failure to maintain financial and billing records and his failure to bill Medicare for over $450,000 in

16

payables during one year. The Committee likewise argues that, by eschewing their responsibilities, Causey and Shealey breached their duty of due care. As to the duty of loyalty, the Committee contends that the Board and its officers breached their duty in that the Board "consciously chose to close the home so that the [Lemington Home Fund, a charitable lending source] could be diverted to Elder Care [another organization which had an interlocking Board of Directors with the Lemington Home]," (Appellant's Br. at 33), and that the officers were dually employed by both the Home and Elder Care, with CFO Shealey allegedly commingling funds of the entities.

The evidence produced by the Committee is such that a fact-finder could conclude that the Home's directors did not have a reasonable basis to believe that Causey and Shealey were reliable and competent. In this regard, the evidence of the numerous deficiencies, the death of a resident in the summer of 2004 that resulted in the placement of the Home's license on probationary status, the staff and operational deficiencies noted in the PrimusCare report, the fact that members of the Board knew that Causey was not working full time, and Shealey's failure to maintain even rudimentary but essential accounting records would enable a fact-finder to conclude that the directors had breached their fiduciary duty of care. This same evidence would support an inference that Causey and Shealey did not exercise "such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances." Finally, the evidence presented by the Committee pertaining to plans to divert the Lemington Home Fund to Lemington Elder Care suffices to create a triable issue on the duty of loyalty claim.

17

The District Court, however, found that the business judgment rule as well as the doctrine of *in pari delicto* applied to shield the directors and officers from liability. We disagree, and will discuss each of these doctrines to illustrate why they are inapplicable here.

1.      Business Judgment Rule

Pennsylvania law provides that "[a]bsent breach of fiduciary duty, lack of good faith or self-dealing, any act as the board of directors, a committee of the board or an individual director shall be presumed to be in the best interests of the corporation." 15 Pa. Cons. Stat. Ann. § 5715(d) (emphasis added). As explained in *Cuker v. Mikalauskas*, 692 A.2d 1042, 1048 (Pa. 1997):

> The business judgment rule should insulate officers and directors from judicial intervention in the absence of fraud or self-dealing, if challenged decisions were within the scope of the directors' authority, if they exercised reasonable diligence, and if they honestly and rationally believed their decisions were in the best interests of the company. It is obvious that a court must examine the circumstances surrounding the decisions in order to determine if the conditions warrant application of the business judgment rule.

*Id.* at 1048. As we have observed, "underlying the [business judgment] rule is the assumption that reasonable diligence has been used in reaching the decision which the rule is invoked to justify." *Miller v. American Tel. & Tel. Co.*, 507 F.2d 759,

18

762 (3d Cir. 1974). "Factors bearing on the board's decision . . . include whether the board . . . was disinterested, whether it was assisted by counsel, whether it prepared a written report, whether it was independent, whether it conducted an adequate investigation, and whether it rationally believed its decision was in the best interests of the corporation." *Cuker*, 692 A.2d at 1046. "Whether the duty of care has been met is a question of fact to be determined by an examination of all the circumstances in the case." *Wolf v. Fried*, 373 A.2d 734, 735 (Pa. 1977).

The District Court relied upon the fact that the Board was assisted by counsel, conducted several meetings, and pursued various options before approving the bankruptcy filing. To be sure, this is the type of evidence that could support application of the business judgment rule as a matter of law. But it is countered by evidence that the Board received numerous red flags as to the competence and diligence of Causey and Shealey. The fact that the Board eschewed a viability study also calls into question the adequacy of a pre-bankruptcy investigation. And finally, there is the evidence that the directors favored Lemington Elder Care over the Home. Where, as here, there is evidence to support a rational conclusion that the directors did not exercise reasonable diligence, application of the business judgment rule cannot be decided on a summary judgment motion.[5] *See Keyser v. Commonwealth Nat'l Fin. Corp.*, 675 F. Supp. 238, 259-61 (M.D. Pa. 1987).

---

[5] The District Court erroneously held that the presumption of the business judgment rule is overcome only by evidence of gross negligence. The District Court cited a

19

2.      *In pari delicto*

*In pari delicto*, expressed in its most basic form, prohibits courts from "lend[ing] their good offices to mediating disputes among wrongdoers." *Bateman Eichler, Hill Richards, Inc., v. Berner*, 472 U.S. 299, 306 (1985). For the doctrine of *in pari delicto* to apply in Pennsylvania, "the plaintiff [must] be an active, voluntary participant in the wrongful conduct or transaction(s) for which it seeks redress, and bear 'substantially equal [or greater] responsibility for the underlying illegality' as compared to the defendant." *Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PricewaterhouseCoopers, LLP*, 989 A.2d 313, 329 (Pa. 2010) (quoting *Bateman Eichler*, 472 U.S. at 306-07).

With respect to *in pari delicto* in a bankruptcy context, "the 'trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor. [Conversely,] [t]he trustee is, of course, subject to the same

---

Delaware Supreme Court case which held that "under the business judgment rule director liability is predicated upon concepts of gross negligence." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (overruled on other grounds). Pennsylvania, however, recognizes directors' and officers' liability for *negligent* breach of fiduciary duty. *See, e.g., Wolf v. Fried*, 373 A.2d 734, 735 (Pa. 1977) ("[E]ven in the absence of fraud, self-dealing, or proof of personal profit or wanton acts of omission or commission, the directors of a corporation may be held personally liable where they have been imprudent, wasteful, careless and negligent and such actions have resulted in corporate losses.").

defenses as could have been asserted by the defendant had the action been instituted by the debtor.'" *Official Comm. of Unsecured Creditors v. R. F. Lafferty & Co.*, 267 F.3d 340, 356 (3d Cir. 2001) (quoting *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1154 (3d Cir. 1989)).

As the District Court noted, however, there is an exception to the applicability of *in pari delicto*, when the complained-of action did not actually benefit the corporation. Thus, although "principals generally are responsible for the acts of agents committed within the scope of their authority," *PricewaterhouseCoopers*, 989 A.2d at 333, "where an agent acts in his own interest, and to the corporation's detriment, imputation generally will not apply," *id.* at 334. This "adverse interest" exception was set forth succinctly in *Lafferty* as follows: "Under the law of imputation, courts impute the fraud of an officer to a corporation when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation." 267 F.3d at 358. As to whether an officer's conduct is motivated by self-interest and benefits the corporation, the Pennsylvania Supreme Court has outlined that "the appropriate approach . . . is best related back to the underlying purpose of imputation, which is fair risk-allocation, including the affordance of appropriate protection to those who transact business with corporations." *PricewaterhouseCoopers*, 989 A.2d at 335.

Here, the District Court found that, because the "defendants[] [did not] receive any personal benefit from its [sic] decision to close Lemington," the adverse interest exception to the doctrine of *in pari delicto* did not apply. (A. 21.) The Committee has presented considerable evidence that

21

the alleged breaches of fiduciary duty were from the defendants' self-interest and did not benefit the Home. For example, the Committee has presented evidence that the officers and directors were simultaneously affiliated with both the Home and Lemington Elder Care, and thus stood to benefit from a transfer of the Home's principal charitable asset to Lemington Elder Care. The Committee also sets forth that Shealey served as a Trustee of Mt. Ararat Church's community-outreach entity during the time that this entity was being pursued by the Board as a possible purchaser of the Home. The Committee also argues that Causey resisted the Pittsburgh Foundation's recommendation to replace her with another individual, and that Shealey neglected to maintain any financial records during his tenure. Thus, it is clear that the alleged actions of the directors and officers were not only harmful to the corporation, but also advanced their own self-interest. The principles of fair risk allocation, moreover, would likely counsel against the Home's assumption of the risk that its directors and officers would consistently engage in actions so completely contrary to its benefit.

Because the Committee has tendered sufficient evidence that the directors' and officers' alleged breaches of fiduciary duty did not benefit the Home but instead benefited their own self-interest, the applicability of the "adverse interest" exception presents a genuine issue of material fact. Summary judgment on this basis is therefore inappropriate.

B.

Finally, it is necessary to deal with the claim of deepening insolvency. This cause of action has not been formally recognized by Pennsylvania state courts. *Lafferty*,

22

267 F.3d at 349. Nevertheless, relying on "decisions interpreting the law of other jurisdictions and on the policy underlying Pennsylvania tort law," this Circuit has found that "the Pennsylvania Supreme Court would determine that 'deepening insolvency' may give rise to a cognizable injury."[6] *Id.* We further clarified the mechanics of this cause of action in *In re Citx Corp.*, 448 F.3d 672 (3d Cir. 2006). There, we stated that "deepening insolvency" in Pennsylvania is defined as "an injury to [a debtor's] corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." 448 F.3d at 677. For such a claim to succeed, it is necessary to demonstrate that the directors' actions caused the deepening of insolvency. *Id.* at 678. We also concluded that fraud is necessary to support a

---

[6] As Appellees have noted in their brief, courts and commentators have increasingly called into question the viability of "deepening insolvency" as an independent cause of action. *See, e.g., In re Global Service Group LLC*, 316 B.R. 451 (Bankr. S.D.N.Y. 2004). Even if our precedent is erroneous, however, it can only be overturned by this Court *en banc*. *See In re Merck & Co. Sec. Litig.*, 432 F.3d 262, 274 (3d Cir. 2005) ("precedential cases cannot be overruled unless by the Circuit *en banc*"). Consequently, we are bound in our decision to follow *Lafferty*, which recognizes deepening insolvency as an independent cause of action in Pennsylvania. Moreover, because no party argued that the concept of deepening insolvency may not apply to, or may involve a different standard for, a non-profit corporation, we will not address that issue. *See United States v. Albertson*, 645 F.3d 191, 195 (3d Cir. 2011) ("[W]e usually refrain from addressing an argument or issue not properly raised and discussed in the appellate briefing.") (citation omitted).

claim of deepening insolvency, and that "a claim of negligence cannot sustain a deepening-insolvency cause of action." *Id.* at 681.

> In Pennsylvania,
>
> > [a]s a general rule, fraud consists in anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture. It is any artifice by which a person is deceived to his disadvantage.
>
> *In re Reichert's Estate*, 51 A.2d 615, 617 (Pa. 1947).

The Committee alleges that fraud "is apparent in the Board's failure to disclose to the creditors and the Bankruptcy Court the Board's decision made in January 2005 to close the Home and deplete the patient census, while delaying the bankruptcy filing until April 2005," (Appellant's Br. at 38), and in "strategically omitting from the Monthly Operating Reports required by Debtors-in-Possession substantial fees paid post-petition to attorneys, accountants, and other consultants to transition the Home's resources to Elder Care," (*id.* at 39.). The Committee points out that as early as January, 2005, the Board had apparently voted to cease admitting new patients. Without new patients and the governmental and insurance support that they would bring, it would be nearly impossible for the Home to generate the income needed to operate. The Committee also notes that a consultant stated that

24

> [f]rom my 2005 meetings with Arthur Baldwin it became clear to me that he was determined to shut the Lemington nursing facility down and had no interest in listening to or discussing any ideas or plans which could lead to its continued operation. . . . Unknown to me at the time was that the Lemington Board had already decided to shut down the home.

(A. 893.) The Committee also noted that a February 24, 2005 memorandum from the United Way of Allegheny County reflects that Chairperson Baldwin had already informed county officials that the Home would file for bankruptcy, "which will lead to the closing of Lemington long-term care and assisted living," and result in the transfer of its residents to other county facilities. (A. 798.) The Committee further points out that Attorney Robert Sable wrote a letter to Highmark Blue Cross Blue Shield, provider of health insurance for the Home, on March 30, 2005, advising them that employee health care coverage was needed for "only an additional 60 days until the transition can take place." (A. 1916.) The Committee thus asserts that, although the Board knew that its actions would cause further deterioration of the Home's finances to the detriment of its creditors, by its silence, the Board consciously defrauded the Home's creditors by implementing these policies and delaying the filing of bankruptcy for a period of four months. Furthermore, with respect to the officers, the Committee alleges that, *inter alia*, the officers continued to commingle the Debtor's funds with related entities, continued to breach their fiduciary duties, continued to do business with vendors although they knew that the Home was insolvent, failed to collect Medicare receivables, upheld the policy of no patient

admissions, and directed the post-petition transfer of Debtor's kitchen and catering equipment, among other items, to related entities.

Considering this evidence in the light most favorable to the Committee as the non-moving party, we find that there is a genuine issue of material fact as to whether the directors and officers fraudulently contributed to deepening the insolvency of the Home. Summary judgment is therefore inappropriate with respect to the Committee's deepening insolvency claim.

## III.

For the foregoing reasons, we will vacate the District Court's grant of summary judgment on the breach of fiduciary duty and deepening insolvency claims, and will remand for trial on these issues.