**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2707
_____

In re:  LEMINGTON HOME FOR THE AGED

OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
ON BEHALF OF THE ESTATE OF LEMINGTON HOME
FOR THE AGED

v.

ARTHUR BALDWIN; LINDA COBB; JEROME
BULLOCK; ANGELA FORD; JOANNE ANDIORIO; J.W.
WALLACE; TWYLA JOHNSON; NICOLE GAINES;
WILLIAM THOMPKINS; ROY PENNER; MELODY
CAUSEY; JAMES SHEALEY; EUGENE DOWNING;
GEORGE CALLOWAY; B.J. LEBER; REVEREND
RONALD PETERS,
                    Appellants
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 2-10-cv-0800)
District Judge: Honorable Arthur J. Schwab
_____

Argued May 14, 2014

Before:   SMITH, VANASKIE, and SHWARTZ, *Circuit Judges.*

(Filed: January 26, 2015)

Michael J. Bowe, Esq. [ARGUED]
Jennifer S. Recine, Esq.
Kasowitz, Benson, Torres & Friedman
1633 Broadway
21st Floor
New York, NY 10019

John R. Gotaskie, Jr., Esq.
Fox Rothschild
625 Liberty Avenue
29th Floor
Pittsburgh, PA 15222

Mark R. Hamilton, Esq.
Rebecca S. Izsak, Esq.
Philip J. Sbrolla, Esq.
Cipriani & Werner
650 Washington Road
Suite 700
Pittsburgh, PA 15228
        *Counsel for Appellants*

Robert S. Bernstein, Esq.
Kirk B. Burkley, Esq.
Nicholas D. Krawec, Esq. [ARGUED]
Shawn P. McClure, Esq.

Arthur W. Zamosky, Esq.
Bernstein-Burkley
707 Grant Street
Suite 2200, Gulf Tower
Pittsburgh, PA 15219
    *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

VANASKIE, *Circuit Judge.*

This lawsuit, which concerns the mismanagement of a Pittsburgh-area nursing home and its ensuing bankruptcy, comes before the Court for a third time on appeal. In the present appeal, the Defendants, two former Officers and fourteen former Directors of the nursing home, present several challenges to the jury's verdict, which found them liable for breach of fiduciary duties and deepening insolvency. The jury also imposed punitive damages against the two Officers and five of the Directors.

We will affirm the jury's liability findings and the punitive damages award imposed against the Administrator and the Chief Financial Officer of the nursing home. We will, however, vacate the jury's award of punitive damages against the Defendants who served on the nursing home's Board of Directors. We conclude that the punitive damages award against those Defendants was not supported by evidence sufficient to establish that they acted with "malice, vindictiveness and a wholly wanton disregard of the rights of others." *Smith v. Renaut*, 564 A.2d 188, 193 (Pa. Super. Ct. 1989) (citations omitted).

3

## I.

The Lemington Home for the Aged ("the Home"), established in 1883, "was the oldest, non-profit, unaffiliated nursing home in the United States dedicated to the care of African-America[n] seniors." App. 857. As part of its mission statement, the Home sought to "[e]stablish, support, maintain and operate an institution that is able to extend nursing home care for persons who are infirm due to age and other reasons, without regard to age, sex, race, religion, and to do so regardless of whether such persons themselves have the ability to pay for such care." App. 858.

Defendant Mel Lee Causey was hired to serve as the Home's Administrator and Chief Executive Officer in September 1997. Defendant James Shealey became the Home's Chief Financial Officer in December 2002 and reported to Causey.[1] Defendants Arthur Baldwin, Jerome Bullock, Angela Ford, Joanne Andiorio, J.W. Wallace, Twyla Johnson, Nicole Gaines, William Thompkins, Roy Penner, Eugene Downing, George Calloway, B.J. Leber, and the Reverend Ronald Peters all served as members of the Board of Directors of the Home (collectively, "Director Defendants"), and had "direct supervisory control, authority and responsibility" over Causey. App. 859.

The Home had been "beset with financial troubles" for decades, but had remained afloat with help from the City of Pittsburgh, Allegheny County, and donations from several

---

[1] When discussed collectively, Shealey and Causey will hereinafter be referred to as the "Officer Defendants."

private foundations. *In re Lemington Home for the Aged* ("*Lemington I*"), 659 F.3d 282, 285 (3d Cir. 2011). The Home's financial difficulties became particularly acute during the early 2000s, under the management of the Officer Defendants. The Home was cited by the Pennsylvania Department of Health for deficiencies at a rate almost three times greater than the average nursing home operating in the state. In 2004, Causey began working part-time in her capacity as Administrator, although state law required all nursing homes to employ full-time Administrators. That year, two patients died under suspicious circumstances while residing at the Home, resulting in investigations by the Pennsylvania Department of Health. The Home's patient recordkeeping and billing were in a state of disarray.

On January 6, 2005, the Board convened and voted to close the Home. However, its Chapter 11 petition was not filed until April 13 of that year. During the intervening period, the patient census dropped to as low as 37 patients. "At a Bankruptcy status conference held on June 23, 2005, no one expressed any interest in funding or acquiring the Home," and the Bankruptcy Court therefore approved the Home's closure. *Lemington I*, 659 F.3d at 289. It was later revealed that the Home had "delayed filing its Monthly Operating Reports for May and June until September 2005," although the reports "would have shown that the Home received nearly $1.4 million in Nursing Home Assessment Tax payments," which could have increased its chances of finding a buyer. *Id*.

In November 2005, the Bankruptcy Court granted the request made by the Committee of Unsecured Creditors ("the Committee") to bring this adversary proceeding against Causey, Shealey, and the Director Defendants claiming

5

breach of fiduciary duty, breach of the duty of loyalty, and deepening insolvency. The District Court granted summary judgment in favor of Defendants on all claims.

On appeal, we vacated the District Court's grant of summary judgment in its entirety, concluding that "our independent review of the record discloses genuine disputes of material facts on all claims." *Id.* at 285. On remand, the District Court set stringent time limits for trial, which the Defendants contested before this Court in a request for a writ of mandamus. We denied the Defendants' request but urged the District Court to consider increasing the time allotted for trial. *In re Baldwin*, 700 F.3d 122 (3d Cir. 2012).

The District Court increased the time limits and the case proceeded to a six-day jury trial, which began on February 19, 2013. At the close of the Committee's case, the Defendants moved for judgment as a matter of law, which the District Court granted with respect to the breach of the duty of loyalty claim against the Director Defendants and denied in all other respects. Following the close of trial, the jury deliberated for three days before returning a compensatory damages verdict against fifteen of the seventeen Defendants, jointly and severally, in the amount of $2,250,000. The jury awarded punitive damages in the amount of $350,000, individually, against five of the Director Defendants. The jury also awarded punitive damages of $1 million against Shealey and $750,000 against Causey.

Following the verdict, the Defendants filed a motion for judgment as a matter of law, a new trial, or remittitur. The District Court denied that motion in its entirety. This appeal followed.

6

## II.

"We exercise plenary review of an order granting or denying a motion for judgment as a matter of law and apply the same standard as the district court." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) (citation omitted). "[A] judgment notwithstanding the verdict may be granted under Fed. R. Civ. P. 50(b) only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001) (quotation marks and citations omitted)). "Because the jury returned a verdict in favor of the plaintiff, we must examine the record in a light most favorable to the plaintiff, giving her the benefit of all reasonable inferences, even though contrary inferences might reasonably be drawn." *Dudley v. S. Jersey Metal, Inc*., 555 F.2d 96, 101 (3d Cir. 1977).

## III.

The Defendants first argue that the Committee introduced insufficient evidence at trial to establish that the Director and Officer Defendants had breached their duty of care and that the Officer Defendants had additionally breached their duty of loyalty. We disagree. The Committee presented evidence to the jury that was sufficient to support a rational finding that the Defendants had breached their fiduciary duties by failing to exercise reasonable diligence and prudence in their oversight and management of the Home.

A. Officer Defendants

Pennsylvania law provides:

> [A]n officer shall perform his duties as an officer in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances.

15 Pa. Cons. Stat. Ann. § 5712(c). The duty of loyalty under Pennsylvania law "requires that corporate officers devote themselves to the corporate affairs with a view to promote the common interests and not their own." *Tyler v. O'Neill*, 994 F. Supp. 603, 612 (E.D. Pa. 1998).

The Committee presented extensive evidence at trial of Causey's mismanagement of the Home in her role as Administrator, clearly satisfying the "minimum quantity of evidence" required to sustain the jury's verdict on appeal. *Trabal*, 269 F.3d at 249. The jury heard testimony that it was Causey's responsibility as the nursing home Administrator to:

> make[] sure that there are contracts in place, that the facility is being managed financially, that bills are being paid, that the nursing staff is adequate in its numbers as well as in their

8

education and training, and that the facility is operating in compliance with both Federal and State regulations, which are really very extensive.

App. 1077.

Evidence presented at trial demonstrated that Causey fell far short of fulfilling these responsibilities. Throughout Causey's tenure, the Home was not in compliance with federal and state regulations. Causey began her role as Administrator in 1997. "[T]here were significant problems identified by the Pennsylvania Department of Health, the inspectors of the nursing home from 1998 through 2004 . . . ." App. 1081. The Home was cited repeatedly for failing to keep proper documentation of residents' clinical records. In 2004, the Department of Health launched an investigation following the death of patient Elaine Carrington. The review concluded that "Causey lacks the qualifications, the knowledge of the PC regulations and the ability to direct staff to perform personal care services as required." App. 1349–50, 2283. This evaluation, citing Causey's inexperience and lack of qualifications, came after Causey had already been in the role of Administrator for more than six years.

The jury also heard testimony that, at the time of Ms. Carrington's death, Causey was not working at the Home full-time, despite holding the title of Administrator and collecting her full salary. Pennsylvania law requires all facilities of the Home's size to employ a full-time Administrator. But in an application for long-term disability benefits she filed with the state, Causey represented that she was working only "20 to 24 hours per week at Lemington"

for more than eight months in 2004.  App. 1457.  When confronted at trial with this portion of her benefits application, Causey avoided giving a precise figure for how many hours she worked during this period, although she eventually admitted, "I was working part-time."  App. 1820.

We are satisfied that the jury was presented with more than sufficient evidence to conclude that Causey breached her duty of care.  Additionally, testimony regarding Causey's self-interested decision to stay on as an Administrator despite being unable to serve full-time as required under state law supported the jury's verdict that she breached her duty of loyalty by collecting her full salary while not in fact fulfilling the duties of the role for which she was being compensated.

The jury also heard sufficient evidence to support its determination that defendant Shealey breached his duties of care and loyalty as Chief Financial Officer.  The Committee presented testimony from William Terrence Brown, a nursing home consultant who had conducted an assessment of the Home on behalf of a major creditor in May 2005.  Brown testified that during his review, he requested records from Shealey, including "the latest financial statements, monthly, internally prepared, the annual audits[,] . . . the last year's Medicare and Medicaid cost reports[,] . . . the nursing reports, the census data[,] . . . accounts receivable and accounts payable, [and] aging reports . . . ."  App. 1196.  Brown testified that he repeatedly asked Shealey for this information, but it was not provided to him.

Brown also testified that, towards the end of his review of the Home, Shealey, in an attempt to avoid Brown's persistent requests for basic financial information, locked himself in his office.  Brown responded by "camp[ing]

10

outside" of Shealey's office, waiting for him to leave in order to speak with him about the Home's finances. App. 1201. Brown testified that when he finally managed to speak with Shealey:

> I said, Mr. Shealey, there really aren't any books; are there? And he said no.
>
> So I said, well, Mr. Shealey, you got to have something that you keep an idea of what kind of cash is in the bank. So what do you use for that?
>
> And he said, well, I've got, you know, a little Excel spread sheet I use, only I try to keep a bank balance.

*Id.* When pressed by Brown as to how long he had operated without a general ledger that recorded the Home's finances in detail, Shealey admitted that "June 30, 2004, was the last time they kept any books." *Id.* Brown testified that Shealey never provided him with the Excel spreadsheet he allegedly used in lieu of a general ledger. Despite Shealey's failure to provide these documents to Brown, minutes from a Board meeting following Brown's visit state that Shealey informed the Board that Brown had "received everything he requested." App. 1870, 3088. Brown also testified that, under Shealey, the Home had failed to bill for Medicare since August 2004. Brown calculated that this resulted in the Home failing to collect at least $500,000 it was due for services rendered. App. 1206.

11

The Committee also introduced into evidence an email that Shealey sent to a representative of Mount Ararat Baptist Church ("Mt. Ararat") in April 2005, before the Home had filed for bankruptcy. The proposal suggested that Mt. Ararat purchase Lemington "to create a revitalized faith based retirement community" named Mount Ararat Retirement Community ("MARC"). App. 6351. The proposal indicated that Shealey would "assume the position of MARC President and Chief Executive Officer." App. 6360. Director Baldwin testified that he believed Shealey's involvement in this potential sale was inappropriate, as Shealey would receive a benefit if the Home was merged with Mt. Ararat. App. 1303, 1315.

The jury therefore heard sufficient evidence to find that Shealey fell far short of fulfilling his duty to act "with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances." 15 Pa. Cons. Stat. Ann. § 5712(c). A person serving as Chief Financial Officer with reasonable skill and diligence would not fail to maintain a general ledger for over nine months, refuse to meet with a consultant hired by a major creditor of the Home, and forgo collection of upwards of $500,000 due to the Home in Medicare payments. Shealey's decision to stay on as CFO despite his inability to competently fulfill the duties with which he was charged, combined with his proposal that Mt. Ararat purchase the Home and elevate him to the position of President and CEO, also gave the jury a sufficient basis for concluding that Shealey acted in self-interest, breaching his duty of loyalty to the Home.

12

## B. Director Defendants

The evidence also supported a finding that the Director Defendants breached their duty of care by failing to take action to remove Causey and Shealey once the results of their mismanagement became apparent.

Pennsylvania law provides:

> (a) Directors.--A director of a nonprofit corporation shall stand in a fiduciary relation to the corporation and shall perform his duties as a director . . . in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances. In performing his duties, a director shall be entitled to rely in good faith on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following: (1) One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters

13

presented. (2) Counsel, public accountants or other persons as to matters which the director reasonably believes to be within the professional or expert competence of such person . . . .

(b) *Effect of actual knowledge.*— A director shall not be considered to be acting in good faith if he has knowledge concerning the matter in question that would cause his reliance to be unwarranted.

15 Pa. Cons. Stat. Ann. § 5712.

The jury heard testimony that the Board was "responsible for the oversight of the nursing home Administrator and for the hiring and firing" of the Home's management staff. App. 1076. The Directors were aware that the Home had "three times the deficiencies" of the average nursing home operating in the state during Causey's tenure as Administrator. App. 1872. The jury heard testimony that an independent review of the Home in 2001 recommended that, due to the Home's continued citations for health violations, Causey should be replaced with a "seasoned nursing home administrator." App. 1095. The report further urged that "[t]he facility cannot improve overall patient care without a competent administrator on staff . . . ." App. 2210. Although the Board sought and obtained a grant of $178,000 from the Pittsburgh Foundation to fund the search for a new Administrator, the funds were never used to find a replacement for Causey, who remained at the Home despite

14

increasing evidence that her "performance as the nursing home administrator was poor." App. 1095.

Although the date by which the Directors became aware that Causey was working part-time from April through December 2004 was contested at trial, some evidence was introduced that the Board allowed Causey to continue to operate and collect her full salary as Administrator with the knowledge she was working part-time, in violation of state law. Director Andiorio testified that Causey informed the Board that she would be working part-time and the Board did not intervene to replace her with a full-time Administrator. App. 1867. The jury also heard testimony from Director Baldwin that the Board elevated Shealey into a role as a "CEO type figure" from December 2004 through May 2005, even after the Board discovered that Shealey had not been maintaining proper financial records for the Home in his role as CFO. App. 1297.

This evidence supported the jury's finding that the Director Defendants did not exercise reasonable prudence and care in continuing to employ Causey and Shealey. The Director Defendants kept Causey in the role of Administrator and CEO for six years in the face of abnormally high deficiency findings. Even after she ceased working at the Home full-time, in violation of state law, the Director Defendants allowed Causey to continue in her role as Administrator. This is not a case where directors, acting in good-faith reliance "on information, opinions, reports or statements" prepared by employees or experts, made a business decision to continue to employ an Administrator whose performance was arguably less than ideal. 15 Pa. Cons. Stat. Ann. § 5712(a). The jury heard testimony that the Director Defendants received several independent reports

15

documenting Causey's shortcomings and urging that she be replaced. The Director Defendants therefore had actual knowledge of her mismanagement, yet stuck their heads in the sand in the face of repeated signs that residents were receiving care that was severely deficient. This is enough to support the jury's verdict that the Director Defendants breached their duty of care to the Home.

IV.

The Defendants next argue that the Committee introduced insufficient evidence to support the jury's verdict that the Defendants had deepened the Home's insolvency. "Even when a corporation is insolvent, its corporate property may have value," which can be damaged by "[t]he fraudulent and concealed incurrence of debt . . . ." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 349 (3d Cir. 2001). Thus, we have predicted that Pennsylvania courts would recognize the tort of deepening insolvency, defining it as "an injury to the Debtors' corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." *Id.* at 347.[2] We are satisfied

---

[2] As they did in *Lemington I*, the Defendants urge us to revisit our prior decision in *Lafferty*, calling to our attention the subsequent decisions of other courts which have refused to recognize deepening insolvency as a tort. As we observed in response to this argument in *Lemington I*, we continue to be bound to follow *Lafferty* unless it is overturned by our Circuit sitting en banc. 659 F.3d at 294 n.6. We also reserved opining on the question of whether deepening insolvency "may not apply to, or may involve a different

16

that the Committee introduced sufficient evidence to support the jury's deepening insolvency verdict.

The Committee presented evidence that the Director Defendants concealed for over three months the Board's January 2005 decision to close the Home and deplete the patient census. In *Lemington I*, we held that this evidence could suggest to a jury that "although the Board knew that its actions would cause further deterioration of the Home's finances to the detriment of its creditors, by its silence, the Board consciously defrauded the Home's creditors by implementing these policies and delaying the filing of bankruptcy . . . ." 659 F.3d at 295. Trial testimony from Brown, the bankruptcy consultant for the major creditors, supported the Committee's theory that the Board's decision to deplete the patient census before it filed for bankruptcy resulted in a "slow death" of the Home's ability to generate revenue. App. 1214. The Committee presented additional evidence that, during the bankruptcy process, the Board failed to disclose in its monthly operating reports that the Home had received a $1.4 million Nursing Home Assessment Tax payment in May 2005, which could have increased the Home's chances of finding a buyer. An email from the Board's bankruptcy attorney to the Board summed up the mismanagement of the bankruptcy process, warning that "we have not established a sale process in a manner that is

standard for, a non-profit corporation," as no party had raised the argument. *Id.* In the present appeal, the Defendants again do not argue that a different standard should apply to deepening insolvency in the non-profit context, so we will not address that question.

17

customarily done in Chapter 11 cases. Nobody has had the opportunity to bid and we have no meaningful financial records." App. 3208.

As to the Officer Defendants, the Committee presented evidence that Causey and Shealey's mismanagement of the Home's finances, inattention to recordkeeping and patient billing, and failure to conduct a proper bankruptcy process damaged the already insolvent Home's value. Shealey did not maintain a general ledger of the Home's finances in his capacity as CFO. As a result of the patient-documentation errors repeatedly identified by the Pennsylvania Department of Health during Causey's tenure, the Home did not recoup reimbursements it was due for care provided to Medicare patients, resulting in an estimated loss to the Home of $500,000. App. 1085–86, 1206. During the bankruptcy process, Shealey refused to meet with Brown, the consultant hired by the Home's major creditors, and did not make information about the Home's financial condition available to potential buyers. All of this conduct damaged the Home's financial viability after it had already become insolvent. Thus, the jury's verdict on the deepening insolvency claim had ample evidentiary support.

V.

Finally, the seven Defendants against whom the jury imposed punitive damages argue that the jury was not presented with certain factual prerequisites necessary to support a punitive damages award. First, the Defendants argue that there was no evidence introduced of any Defendant's financial status, even though wealth is a relevant consideration for punitive damage awards under Pennsylvania law and the District Court instructed the jury that they could

18

consider the Defendants' wealth in fixing the amount of punitive damages. The Defendants also argue that the jury was not presented with sufficient evidence of the Defendants' subjective state of mind to justify the imposition of punitive damages.

Although we conclude that wealth evidence is not a necessary prerequisite for an award of punitive damages under Pennsylvania law, we agree that the evidence presented to the jury did not contain the minimum quantum of proof of outrageous conduct necessary to support a punitive damages award against any of the Director Defendants. We will therefore vacate the punitive damages imposed against five of the Director Defendants. However, because we conclude that adequate state-of-mind evidence was presented to support a finding that Shealey and Causey acted "outrageously," we will affirm the jury's punitive damages verdict as to them.

A.  Evidence Regarding Wealth of the Defendants

At the close of trial, the District Court instructed the jury on the relevant factors they could consider in fashioning a punitive damages award under § 908(2) of the Second Restatement of Torts, which Pennsylvania has adopted. In particular, the Court instructed the jurors that they could consider "[t]he wealth of the Defendant or Defendants insofar as it is relevant in fixing an amount that will punish him or her, and deter him or her and others from like conduct in the future." App. 63. However, no evidence of the Defendants' wealth had been introduced to the jury during the trial in any form, either testimonial or documentary.

Defendants argue that the punitive damage award cannot stand because the jury was not presented with any

evidence regarding the wealth of any Defendant and therefore could not evaluate what amount of punitive damages would serve as an appropriate deterrent. The wealth of a defendant is indeed one of the three factors that "can properly [be] consider[ed]" by the trier of fact in assessing an award of punitive damages under § 908(2). Nonetheless, that section's use of the permissive "can," rather than the compulsory "must," suggests that evidence of a defendant's wealth is not a necessary prerequisite to an award of punitive damages. The weight of Pennsylvania case law agrees that "evidence of a tortfeasor's wealth is not a necessary condition precedent for imposition of an award of punitive damages." *Vance v. 46 and 2, Inc.*, 920 A.2d 202, 207 (Pa. Super. Ct. 2007) (collecting cases).

Despite § 908(2)'s permissive language, the Defendants urge that evidence of wealth is a necessary prerequisite to an award of punitive damages. The Defendants point to case law which they claim suggests that the fact finder is required to weigh a defendant's wealth to properly calibrate an assessment of punitive damages. In *Kirkbride v. Lisbon Contractors, Inc.*, 555 A.2d 800 (Pa. 1989), the Pennsylvania Supreme Court rejected a defendant's claim that a punitive damages award must be proportional to an award of compensatory damages, noting that such a requirement would undermine the deterrent purpose of such awards:

> If the purpose of punitive damages is to punish a tortfeasor for outrageous conduct and to deter him or others from similar conduct, then a requirement of proportionality defeats that

20

purpose. It is for this reason that the wealth of the tortfeasor is relevant. In making its determination, the jury has the function of weighing the conduct of the tortfeasor against the amount of damages which would deter such future conduct. In performing this duty, the jury *must weigh* the intended harm against the tortfeasor's wealth. If we were to adopt the Appellee's theory [of proportionality to compensatory damages], outrageous conduct, which only by luck results in nominal damages, would not be deterred and the sole purpose of a punitive damage award would be frustrated.

*Id*. at 803 (emphasis added).[3]

---

[3] *Kirkbride*'s holding that a punitive damage award does not need to be proportional to the compensatory damages assessed in a given case has been subsequently called into question by a string of Supreme Court cases holding that, as a matter of due process, "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 426 (2003). The Defendants do

Although the reasoning of the *Kirkbride* decision evinced a concern with ensuring that a punitive damages award must be sufficiently large to deter future wanton conduct by a wealthy defendant, a decision from the Eastern District of Pennsylvania has interpreted *Kirkbride*'s language as a limitation on a court's ability to impose punitive damages absent any evidence of the defendant's wealth. In *Rubin Quinn Moss Heaney & Patterson, P.C. v. Kennel*, 832 F. Supp. 922, 936 (E.D. Pa. 1993), the District Court noted as a consideration in its decision declining to impose punitive damages that "the record is devoid of evidence concerning [the defendant's] wealth." Citing *Kirkbride*, the District Court concluded that it was "required to assess the impact the [punitive] damages would have on the Defendant's financial position," which it could not do given the state of the record. *Id.*

The weight of the Pennsylvania appellate case law, however, interprets *Kirkbride* differently and concludes that evidence of wealth is not required to assess punitive damages under Pennsylvania law. In *Vance*, the Superior Court of Pennsylvania rebuffed a claim that *Kirkbride* "requires that the jury be presented with evidence of a tortfeasor's wealth before they can impose punitive damages." 920 A.2d at 206.

_____

not press a constitutional due process claim regarding punitive damages as a part of this appeal, so we will "decline to resolve the thorny issue presented by the apparent conflict" between *Kirkbride* and the Supreme Court's subsequent pronouncements on proportionality in punitive damage awards. *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 741 (3d Cir. 1991).

The Superior Court noted that *Kirkbride* was concerned with the distinct question of whether "an award of punitive damages had to be proportional to, or bear a reasonable relationship to, an award of compensatory damages." *Id.* Although the *Vance* court acknowledged that "wealth of the tortfeasor is a relevant consideration in effectuating the purpose of punitive damages," it concluded that "*Kirkbride* does not stand for the proposition that a jury cannot impose punitive damages without evidence of record pertaining to the defendant tortfeasor's wealth." *Id.* The Superior Court later reaffirmed this holding in *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 215 (Pa. Super. Ct. 2003), which held that "the polestar for the jury's assessment of punitive damages is the outrageous conduct of the defendants, not evidence of a defendant's wealth." Similarly, in *Shiner v. Moriarty*, 706 A.2d 1228, 1242 (Pa. Super. Ct. 1998), the Superior Court "reject[ed] the suggestion that evidence of net worth is mandatory" to impose punitive damages.

In light of the aforementioned decisions and the permissive, rather than compulsory language of § 908(2), we agree with the District Court that Pennsylvania law does not require evidence of a defendant's wealth before punitive damages may be imposed. For whatever reason, parties may make the strategic decision to not introduce such evidence at trial, and that decision is not a basis for vacatur of a punitive damages award on appeal.

B.  Evidence of Outrageous Conduct by Defendants

"'Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.'" *Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984) (quoting Restatement

23

(Second) of Torts, § 908(2)). "Punitive damages . . . are not awarded to compensate the plaintiff for her damages but rather to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Phillips v. Cricket Lighters*, 883 A.2d 439, 446 (Pa. 2005) (citation omitted). "The state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." *Feld*, 485 A.2d at 748. "[W]e must make a 'careful analysis of the entire trial record' and examine whether the plaintiffs provided sufficient evidence to support a punitive damage award." *David by Berkeley v. Pueblo Supermarket of St. Thomas*, 740 F.2d 230, 237 (3d Cir. 1984) (quoting *Berroyer v. Hertz*, 672 F.2d 334, 341 (3d Cir. 1982)). "'[F]or punitive damages to be awarded there must be acts of *malice, vindictiveness and a wholly wanton disregard of the rights of others*.'" *Tunis Bros.*, 952 F.2d at 741 (quoting *Smith*, 564 A.2d at 193) (emphasis added).

### 1. Director Defendants

As to the Director Defendants—Andiorio, Baldwin, Thompkins, Johnson, and Bullock—insufficient evidence was presented to support a finding that any of them possessed a sufficiently culpable state of mind to warrant the imposition of the "extreme remedy" of punitive damages, which Pennsylvania courts have cautioned should be awarded "in only the most exceptional matters." *Phillips*, 883 A.2d at 445. In its decision affirming the punitive damages award against five of the Director Defendants, the District Court pointed to the same conduct that it held had supported the compensatory damages award against all of the Director Defendants. Specifically, the District Court noted the Board's failure to replace Causey despite awareness of her poor performance as Administrator, the Board's January 2005

24

decision to close the Home which was not disclosed until April, and the mismanagement of the bankruptcy process by the Board. App. 42–43. Explaining the jury's potential rationale for imposing punitive damages against only five of the members of the Board, the District Court concluded that, based on its "detailed review of the exhibits," the Director Defendants against whom punitive damages were awarded had "received more correspondence relating to the closure of the Home than the other Defendants against whom liability was imposed, but no punitive damages were assessed." App. 43–44. The amount of information individual directors knew is certainly relevant to establishing their liability for inaction and fraudulent nondisclosure. Nevertheless, we do not think that, on its own, evidence of the receipt of correspondence provided the jury with a sufficient basis to conclude that any of the five Director Defendants had engaged in "a quantum of outrageous conduct *in addition* to that undergirding the . . . liability . . . ." *Tunis Bros*., 952 F.2d at 741 (emphasis added).

Our decision in *Donaldson v. Bernstein*, 104 F.3d 547 (3d Cir. 1997), in which we sustained a punitive damages award against a debtor's two principals who had engaged in self-dealing, provides a helpful point of contrast. Unlike the evidence in that case, no evidence was presented in this matter that the Directors against whom the jury assessed punitive damages acted out of self-interest. Indeed, in a decision that the Committee does not appeal, the District Court directed a verdict in favor of all of the Directors on the Committee's claim that they had breached their duty of loyalty to the Home. App. 1677. The District Court therefore found the record could not possibly support an inference that the Directors' conduct was motivated by the intention to

25

extract a personal profit at the expense of the best interests of the Home. *See In re Lampe*, 665 F.3d 506 (3d Cir. 2011) (directors' duty of loyalty prohibits them from "directly or indirectly, utiliz[ing] their position to obtain any personal profit or advantage other than that enjoyed also by their fellow shareholders" (quoting *Tyler*, 994 F. Supp. at 612)). The absence of evidence of self-dealing by any of the Director Defendants weighs heavily against the imposition of the "extreme" remedy of punitive damages.

Moreover, the District Court acknowledged that three of the Director Defendants against whom punitive damages were imposed—Thompkins, Johnson, and Bullock—were mentioned only fleetingly during the course of trial testimony. The District Court cast the failure to call Thompkins, Johnson, and Bullock as witnesses, or to ask questions of other witnesses about their conduct, as a strategic decision made by both parties, similar to the decision to not present testimony regarding the Defendants' financial statuses. But unlike evidence of a defendant's wealth, which "is not a necessary condition precedent for imposition of an award of punitive damages," *Vance*, 920 A.2d at 207, evidence of "outrageous or malicious conduct" *is* a necessary "legal and factual prerequisite" for a punitive damages award. *Tunis Bros.*, 952 F.2d at 740. Therefore, it is the plaintiff who bears the burden of proving that the defendants' conduct was outrageous in order to obtain a punitive damages award. A vacuum of evidence at trial on this topic does not affect both sides equally; rather, plaintiff loses, having failed to carry her burden.

In light of the lack of state-of-mind evidence presented by the Committee regarding the Director Defendants against whom the jury imposed punitive damages, we will vacate the

jury's award of punitive damages against those five Defendants.

## 2. Officer Defendants

We have no such concerns about the punitive damages assessed against the Officer Defendants. The mismanagement of the Home by Causey and Shealey was the focus of the Committee's proof at trial. As detailed above, the Committee presented sufficient evidence at trial to sustain the jury's verdict that both Officer Defendants breached their duty of loyalty to the Home. In *Donaldson*, we held that evidence of self-dealing by trustees provided sufficient factual support for imposition of a punitive damages award. 104 F.3d at 556–57. Likewise, the evidence of self-dealing presented at trial gave the jury a sufficient factual basis to conclude that the Officer Defendants acted with the outrageous motive of pursuing self-enrichment at the expense of the non-profit nursing home to which they owed fiduciary duties.

In addition to the evidence of self-dealing, the Officer Defendants' state of mind was illuminated by their own testimony at trial. Both Causey and Shealey responded evasively under cross-examination to questions about their conduct, allowing the jury to infer that they had acted culpably and continued to avoid recognizing the gravity of their misconduct. For instance, the Committee questioned Causey about the apparent conflict between her state-benefits application and her trial testimony regarding how much time she had worked during an eight month period in 2004. Causey first attempted to claim that she had worked "a minimum of 35 hours a week," as required by state law, throughout this period. App. 1819. When reminded that she

had signed a state-benefits application "under penalties of law" claiming that she was working just 20 to 24 hours a week during the same period, Causey admitted, "I was working part-time." App. 1820. Similarly, Shealey conceded at trial that he had refused to give Brown, the bankruptcy consultant for the creditors, the financial information he requested. Although Shealey initially claimed this was because Shealey "didn't know who [Brown] was," he later acknowledged that he had continued to refuse to cooperate even after being informed that Brown was a financial consultant. App. 1556–57. Taken together with the other evidence of their malfeasance, Causey and Shealey's obfuscations at trial offered further support for the conclusion that they had acted outrageously, supporting the jury's imposition of punitive damages against them.

## VI.

For the foregoing reasons, we will affirm the jury's liability verdict as to all Defendants and the punitive damages award against the Officer Defendants. We will vacate the award of punitive damages imposed against Defendants Andiorio, Baldwin, Thompkins, Johnson, and Bullock.