NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 16-3079

_____

ROBERTS TECHNOLOGY GROUP, INC.,
Appellant

v.

CURWOOD, INC.

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-14-cv-05677)
District Judge:  Hon. Mark A. Kearney

_____

Submitted Under Third Circuit LAR 34.1(a)
June 15, 2017

Before:  JORDAN, KRAUSE, and GREENBERG, *Circuit Judges.*

(Opinion Filed:  June 16, 2017)

_____

OPINION[*]

_____

_____

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

## I. OVERVIEW

A jury awarded Roberts Technology Group ("RTG") $3 million in a breach-of-contract suit against Curwood, Inc. In response to the verdict, Curwood filed a motion for judgment as a matter of law. It argued that the verdict should be set aside because RTG had failed to present sufficient evidence to establish the net profits attributable to the alleged breach. The District Court granted the motion and ordered a new trial solely on the issue of damages. At the conclusion of that second trial, the jury awarded $971,429 to RTG. That lower sum prompted this appeal, in which RTG contends that it had sufficiently established lost net profits in the first trial. We agree and will vacate the District Court's order granting a new trial and will remand for the original verdict to be reinstated.

## II. BACKGROUND[1]

Since 1995, RTG has specialized in designing, manufacturing, and selling plastic films for use in covering food trays, as well as machines that can attach the films to the trays. In 2011, RTG sought to expand its operations by selling a unified film-plus-tray product in order to provide customers with "a complete solution." (App. 302.) In pursuit of that goal, RTG entered into an agreement with Curwood to distribute Curwood's food

---

[1] Since we are reviewing a grant of judgment against the party that won at trial, we examine the record in the light "most favorable to [RTG,] giving [it] the benefit of all reasonable inferences, even though contrary inferences may reasonably be drawn." *See In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015) (quoting *Dudley v. S. Jersey Metal, Inc.*, 555 F.2d 96, 101 (3d Cir. 1977)).

trays to RTG's customers. As part of the deal, Curwood insisted that RTG provide it with a "Distributor Lead Form" for each potential customer, including the customer's name, location, and estimated sales volume. RTG was reluctant to share that information because it had invested significant time, effort, and money to identify potential customers and to form relationships with them. Ultimately, RTG agreed to share its Lead Forms, based on Curwood's assurance that RTG would be the exclusive distributor of Curwood's trays to any client approved from a Lead Form. Once a customer was approved, Curwood added the customer to a list of "protected" companies and assured RTG that "[a]ll contact to th[e] customer [would] be through RTG." (App. 63.) Curwood ended up approving over 60 Lead Forms.

Curwood did not honor that agreement. Despite its assurance that RTG would be the exclusive distributor of Curwood's products to each of the protected clients, Curwood agreed to sell its trays directly (i.e. without RTG) to Aramark, one of the protected companies. Similarly, Curwood entered into a $4 million, multi-year agreement with Oliver Packaging & Equipment Company, a competitor of RTG's, under which Oliver would distribute Curwood's food trays to additional clients on the protected list.

RTG responded by filing suit against Curwood in the United States District Court for the Eastern District of Pennsylvania. RTG asserted claims for breach of contract, intentional interference with contractual relations, intentional interference with prospective contractual relations, fraudulent misrepresentation, breach of the covenant of good faith and fair dealing, unjust enrichment, and promissory estoppel. Curwood

3

brought counterclaims for breach of contract, promissory estoppel, and unjust enrichment.

At trial, RTG's damages expert, John Maloney, estimated that RTG had lost approximately $3.4 million because of Curwood's breach. Maloney is a Certified Public Accountant with over 30 years of experience. He is also a Certified Valuation Analyst, is accredited in business appraisal review, and is certified in financial forensics. As part of his testimony, Maloney explained that he arrived at his damages estimate after reviewing RTG's financial documents, conducting tests, and interviewing RTG personnel.

Maloney split his damages analysis into two parts – damages attributable to the Aramark account, and damages attributable to Curwood's deal with Oliver.[2] First, Maloney explained that RTG earned 12.9 cents for each tray it sold to Aramark, that its gross profit margin was 14 percent, and that, but for the breach, it would have sold an additional 7.7 million trays to Aramark each year for four years. Maloney thus concluded that RTG had lost $542,645 in net profits from tray sales. Maloney performed the same analysis to conclude that RTG lost an additional $115,661 in film sales to Aramark. After applying a statutory interest rate, Maloney concluded that RTG lost a total of $687,538 because of Curwood's deal with Aramark.

Maloney applied a similar methodology when calculating the amount of profits RTG lost because of Curwood's agreement with Oliver. He used sales records to

---

[2] While there were over 60 protected accounts, Maloney limited his analysis to 28 accounts. He explained that he limited his analysis to those accounts because "they were the only accounts in which [he] could get reasonable numbers as far as the number of annual trays." (App. 390.)

estimate the volume of sales RTG would likely have made and relied on RTG's accounting records to predict how much revenue and profit it would have been able to extract from those sales. During his direct examination, Maloney explained that the average profit margin for the protected accounts (excluding Aramark) was 43.7% for trays and 51.5% for film. When calculating his damages estimate, however, Maloney applied a more conservative profit margin – 35% for trays and 40% for film. When asked to explain why he chose lower profit margins, Maloney said that he chose them because he thought they were "reasonable number[s] to use." (App. 395.) Based on those estimates, Maloney concluded that RTG had lost a total of $2,716,666 of net profits because of Curwood's agreement with Oliver. After combining the lost profits from Aramark with the lost profits from Curwood's agreement with Oliver, Maloney concluded that RTG had lost a total of $3,404,204 of net profits because of Curwood's breach.

On cross-examination, counsel for Curwood asked Maloney whether his calculations took into account various expenses that RTG would have incurred in order to make its profits, including salaries, employee benefits, travel expenses, marketing expenses, and other promotional expenses. Maloney indicated that he had considered employee salaries, but concluded that he did not need to address them in his report because "those salaries had already been paid." (App. 398.) As to the other expenses, Maloney explained that he did not address them in his report because "it wasn't necessary and I already had used a lower average gross profit margin." (App. 399.)

5

The jury returned a verdict in favor of RTG on its breach of contract claim, awarding damages of $3 million. The jury also awarded Curwood $83,880.42 on its counterclaim for breach of contract. Following the verdict, Curwood invoked Federal Rule of Civil Procedure 50(b) and asked for judgment as a matter of law. It argued that, based on the evidence presented at trial, no reasonable jury could have calculated the net lost profits RTG experienced as a result of the breach. Curwood maintained that Maloney's testimony focused on gross lost profits, rather than net lost profits[3] and that, in doing so, he failed to take into account numerous expenses that would have decreased the loss suffered by RTG.[4] The Court decided to order a new trial on damages.

In reaching that decision, the Court explained that "the proper measure of lost profits is net profits, not gross." (App. 27.) The Court then reviewed the trial testimony and concluded that RTG presented evidence relating to gross profits, but failed to present evidence showing the net profits it had lost from Curwood's breach.

After recounting the trial testimony, the Court observed that "[t]he inescapable conclusion drawn from Mr. Maloney's trial testimony—based entirely on his expert

---

[3] In broad terms, "gross profit" refers to the difference between the sale price of a product and the cost of goods sold. *Brown v. N.L.R.B.*, 462 F.2d 699, 702 (9th Cir. 1972) ("A dealer's gross profit is the difference between the cost of [goods] to him and the price he sells them."). The term "net profit" refers to the difference between the sale price of a product and each of the expenses incurred as part of the sale process (e.g., the purchase price of the product, marketing costs, etc.). *Id.* ("Net profit is derived by deducting [a dealer's] costs of operation from his gross profit.").

[4] Curwood also asserted that RTG failed to mitigate damages and moved for remittitur. However, because the District Court granted Curwood's motion based on the gross profits argument, the Court did not reach Curwood's other arguments, which, of course, it may address if renewed on remand.

6

report—is his damages calculations do not involve any review of costs pegged to the number of units sold." (App. 31 (internal quotation marks omitted).) In reaching that conclusion, the Court referred to Maloney's statement that gross profits and net profits were "one and the same" in the context of Curwood's breach, as well as his assertion that he did not need to account for expenses related to employee salaries, employee benefits, or marketing. (*Id.*) The Court rejected that theory:

> RTG ... argues the bulk of its costs were borne up front, and any remaining costs were "zero or minimal." ... RTG offers no evidence to this effect other than Mr. Maloney's unsupported statement regarding salaries already being paid. No other witness offered by RTG testified as to any quantification of its costs in obtaining business or generating any future revenue.

(App. 34.) Rather than entering judgment as a matter of law, the Court exercised its discretion under Rule 50(b)(2) to order a new trial on damages only. The Court explained:

> While Curwood did not move for a new trial on damages, it is within our discretion to grant such a remedy if we determine the malady may be cured in a second trial. Because we find the scintilla of damages evidence does not sufficiently support the jury's finding on net lost profit damages, we order a new trial on Plaintiff's damages alone and permit the parties to more fully address RTG's net profits lost ... as a result of the breach of contract ... .

(App. 35 (footnotes omitted).) After the second trial,[5] the Court entered a final order.

This appeal followed.

---

[5] As earlier noted, the jury in the second trial awarded RTG $971,429 in damages. Neither party challenges the verdict reached in the second trial.

7

## III.   DISCUSSION[6]

"We exercise plenary review of an order granting or denying a motion for

judgment as a matter of law and apply the same standard as the district court."[7]

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) (citing *Wittekamp*

*v. Gulf & Western Inc.*, 991 F.2d 1137, 1141 (3d Cir. 1993)).  A motion made under Rule

50(b) should be granted "only if, as a matter of law, the record is critically deficient of

that minimum quantity of evidence from which a jury might reasonably afford relief."  *In*

*re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015) (quoting *Trabal v.*

*Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001)).  In reviewing the

record, we must view "the evidence in the light most favorable to the nonmovant" – RTG

– and must give the nonmovant "the advantage of every fair and reasonable inference."

---

[6] The District Court had subject matter jurisdiction under 28 U.S.C. § 1332.  We have jurisdiction pursuant to 28 U.S.C. § 1291.  Curwood contends that we do not have jurisdiction because the order that is the subject of the appeal was not a final judgment. While it is true that the District Court's grant of Curwood's 50(b) motion was not a final order at the time it was entered, the order became final and appealable once the Court entered final judgment following the second trial.  *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 460 F.3d 470, 476 (3d Cir. 2006) (explaining "[t]he general rule that once all claims against all parties have been dismissed a prior order will become final for purposes of appeal.").

[7] Curwood argues that we should review the District Court's decision under an "abuse of discretion" standard.  We disagree.  The decision to grant a new trial is subject to review for abuse of discretion, *Cone v. West Va. Pulp & Paper Co.*, 330 U.S. 212, 215 (1947) ("[Rule 50(b)] does not compel a trial judge to enter a judgment notwithstanding the verdict instead of ordering a new trial; it permits him to exercise a discretion to choose between the two alternatives."), but the question on appeal is not whether the District Court erred in ordering a new trial; it is instead whether the Court erred in granting Curwood's motion for judgment as a matter of law *at all*.  We review that question de novo.  *In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015).

8

*Lightning Lube, Inc.*, 4 F.3d at 1166. Nevertheless, "we must affirm an order granting judgment as a matter of law if, upon review of the record, it is apparent that the verdict is not supported by legally sufficient evidence." *Id.*

It is undisputed that, under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), the substance of this case is governed by Pennsylvania law. In Pennsylvania, "damages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences." *Delahanty v. First Pa. Bank, N.A.*, 464 A.2d 1243, 1257 (Pa. Super. Ct. 1983) (citation omitted). Pennsylvania law also provides that damages in a breach of contract case are equal to the amount of revenue lost as a result of the breach, minus the costs avoided as a result of the same breach. *Kutner Buick, Inc. v. Am. Motors Corp.*, 868 F.2d 614, 618 (3d Cir. 1989) (applying Pennsylvania law); *Hallmark Ins. Admr's v. Colonial Penn Life Ins. Co.*, 990 F.2d 984, 989 (7th Cir. 1993) (citing *Kutner Buick,* 868 F.2d at 618) (same). In other words, Pennsylvania law dictates that a successful plaintiff in a breach-of-contract suit is entitled to recover the net lost profits caused by the breach. Given the deferential standard the District Court was required to apply in reviewing the jury verdict, we conclude that RTG presented sufficient evidence to support the conclusion that it lost approximately $3 million in net profits.

Maloney indicated that his estimate of lost net profits was equal to his estimate of lost gross profits – that, in this case, net profits and gross profits are "really one and the same[.]" (App. 397.) On cross-examination, Curwood's counsel challenged that conclusion by identifying several expenses that RTG might have avoided as a result of

9

Curwood's alleged breach. Specifically, Curwood's counsel questioned Maloney about employee salaries and benefits, as well as expenses related to travel, client entertainment, and marketing. In response, Maloney explained why the expenses identified by Curwood did not undermine his analysis. He said that he did not need to include employee salaries in his damages calculations because the salaries "had already been paid[,]" and were thus fixed costs that RTG would have incurred regardless of Curwood's breach. (App. 398.) He further opined that it "wasn't necessary" to include any of the other expenses Curwood identified. (App. 399.) According to Maloney, what variable costs might have been associated with generating the profits in question were effectively backed out because he "already had used a lower average gross profit margin." (App. 399.)

While it was RTG's burden to prove damages, *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998), once it had done so with reasonable rather than mathematical certainty, it became "the defendant's obligation to prove that a lesser amount than that claimed by plaintiff would sufficiently compensate for the loss." *Phila. Television Network, Inc. v. Reading Broad., Inc.*, 2005 WL 1668346, at *33 (Pa. Ct. Com. Pl. July 14, 2005) (quotation omitted); *see Morrow-Smith Co. v. Cleveland Tractor Co.*, 145 A. 915, 915 (Pa. 1929) ("The ... question involved ... asks us to decide only whether the agreed discounts accurately measure plaintiff's damages. ... [T]his question is not raised by the affidavit of defense, and hence ... could not stand in the way of judgment ... ."); *Moyer v. White*, 48 Pa. D. & C.3d 487, 503 (Ct. Com. Pl. 1988). Curwood failed to identify any evidence showing that, in the absence of its breach, RTG would have incurred additional expenses. While Curwood identifies costs that RTG

10

incurred, it failed to show how those costs were avoided or reduced because of Curwood's breach. For example, Curwood claims that "RTG's evidence showed unequivocally that there were costs—including marketing costs, trips to trade shows, employee salaries, and processing costs—that the company avoided when it stopped marketing and selling trays." (Ans. Br. 17.) However, Curwood does not provide any citations to the record to support that assertion. In fact, viewing the record in RTG's favor, it appears that the expenditures for trade shows and marketing were made to gather information useful in forming relationships with potential clients. (*See* App. 314-15 (explaining that RTG would invest substantial resources to build relationships and trust with potential customers and that, after investing those resources, it would submit a Distributor Lead Form to Curwood).) Curwood has cited nothing to support its claim that RTG expended additional resources to obtain sales on an account after establishing a sufficient relationship with a prospective client to submit a Distributor Lead Form.[8]

Curwood argues that we should affirm the District Court based on our decision in *Deaktor v. Fox Grocery Co.*, 475 F.2d 1112 (3d Cir. 1973). In that case, we affirmed a grant of summary judgment against a plaintiff for failing to distinguish between gross profits and net profits. *Id.* at 1114-17. In doing so, we acknowledged that "[o]ther than the unsupported statement that *net* profit would have increased in the same amount as

---

[8] In granting Curwood's motion, the District Court referenced an email from RTG in which it acknowledged some of its marketing expenses. At trial, the e-mail was read into the record. The e-mail states: "Our advertising, marketing, trade shows, sales personnel, travel expenses, and legal fees have exceeded $350,000 to promote your product ... ." (App. 276.) While the e-mail provides evidence that RTG incurred marketing expenses, it is silent as to whether those expenses were ongoing, or whether the expenses were one-time costs that had already been paid to acquire customers.

gross profit, the record was barren of evidence concerning net profit." *Id.* at 1116. Unlike in *Deaktor*, the record in this case contains sufficient evidence upon which a jury could rely to conclude that RTG would not have incurred any additional substantial expenses in the absence of a breach. The jury was free to evaluate Maloney's opinion that each of the costs identified by Curwood was either a sunk cost or was accounted for by the lower gross profit margin estimate he selected.

We note that Curwood had the opportunity to cross-examine Maloney and to identify and expose any flaws in his analysis. And the jury may have been persuaded in some degree by Curwood's cross-examination, since the damages award was $400,000 less than the estimate presented by Maloney.

Our conclusion that Curwood is not entitled to judgment as a matter of law does not amount to an endorsement of Maloney's analytical approach. But, as the District Court recognized, the proper way to challenge improper expert testimony is through a *Daubert* motion filed before trial, or, if testimony extends beyond the scope of an expert report, through an objection made at the time the improper testimony is elicited. A motion for judgment as a matter of law is not an adequate substitute for those well-established mechanisms. At this point, we are reviewing the jury's verdict and must affirm if any reasonable jury could have reached the verdict in light of the evidence presented at trial. We conclude it could have.

**IV.   CONCLUSION**

For the foregoing reasons, we will vacate the District Court's order granting Curwood's motion for judgment as a matter of law and will remand with instructions to reinstate the first jury's verdict.